IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:23-cv-00134-DDD-MDB

IVY HART, *individually and as personal representative*
for the ESTATE of GLYN HART, *deceased*, and
LUCAS HART, *individually*,

 Plaintiffs,

v.

CITY OF LA JUNTA;
ARKANSAS VALLEY REGIONAL MEDICAL CENTER;
MITCH ZGORZYNSKI, *individually*;
TODD QUICK, *individually*; and
JAMES BRADY,

 Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

 Glyn Hart committed suicide with the drawstring of his hoodie while in his cell at the Otero County Jail. Prior to that, he had been evaluated by a doctor at Arkansas Valley Regional Medical Center, who released him into police custody. His children, Ivy and Lucas Hart, bring this case alleging the city, hospital, arresting officer, chief of police, and physician who evaluated their father violated his constitutional and statutory rights and caused his death. *See* Dkt. 1 at 13–20. His complaint alleges five federal claims (four Section 1983 claims and one claim under 42 U.S.C. § 1395dd) and three claims under state law (two claims under C.R.S. § 13-21-131 and one common law claim).

 The Defendants have moved for summary judgment. *See* Dkt. 64, 65, 67, 68. Plaintiffs' federal claims must be dismissed for the reasons discussed below. And though it appears Plaintiffs may have evidenced

genuine disputes of material fact regarding some of their state-law claims, exercising federal jurisdiction over the non-federal claims would be improper, so they are dismissed without prejudice.

## BACKGROUND

On November 1, 2021, Glyn Hart crashed into a parked car while under the influence of drugs and alcohol. Dkt. 64 at 4; Dkt. 71 at 1. He was arrested at the scene by police and taken to Arkansas Valley Regional Medical Center to get medical clearance from a physician before he could be booked into the Otero County Jail. Dkt. 64 at 4; Dkt. 71 at 2. During that process, Mr. Hart communicated that he was suicidal to both the arresting officer, Officer Mitch Zgorzynski, and the physician who evaluated him at the hospital, Dr. James Brady. Dkt. 64 at 4; Dkt. 64-9 at 4.

Following his evaluation, Dr. Brady determined Mr. Hart was medically stable to be released into police custody and discharged him. Dkt. 64 at 4–5; Dkt. 71 at 4, 6. In doing so, Dr. Brady filled out a medical clearance report with instructions to contact a mental health treatment center "if [Mr. Hart's] suicidal ideation persists," Dkt. 64 at 5; Dkt. 71 at 6, and told Officer Zgorzynski "to watch [him and] have him come in for an evaluation when he is sober." Dkt. 64 at 5; Dkt. 71 at 1. In response, Officer Zgorzynski said he would inform the staff at the jail about Mr. Hart's condition and have him placed on suicide watch. Dkt. 64 at 5; Dkt. 71 at 1. After arriving at the Otero County Jail, however, Officer Zgorzynski placed Mr. Hart into a holding cell alone while he left to complete paperwork and field phone calls. Dkt. 71 at 3; Dkt. 91 at 2. Mr. Hart went unmonitored for an hour and fourteen minutes and, in that time, removed the drawstring from his hoodie, tied it to his cell bars, and committed suicide by asphyxiating himself. Dkt. 64 at 5; Dkt. 82 at 11.

## STANDARD OF REVIEW

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.* If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding whether the moving party has carried its burden, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Adamson*, 514 F.3d at 1145; *Scott v. Harris*, 550 U.S. 372, 378 (2007). But unsupported conclusory allegations or mere traces of evidence are not sufficient to demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009); *Scott*, 550 U.S. at 380 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). And "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

**DISCUSSION**

Plaintiffs' Complaint brings the following federal claims:

- Inadequate Physical Plant/Wrongful Death under Section 1983 against the City of La Junta
- Inadequate Supervision/Wrongful Death under Section 1983 against the City
- Inadequate Training/Wrongful Death under Section 1983 against the City
- Inadequate Staffing/Wrongful Death under Section 1983 against the City

It brings the following state claims:

- Supervisory Liability/Wrongful Death under C.R.S. § 13-21-131 against Chief Todd Quick
- Due Process/Wrongful Death under C.R.S. § 13-21-131 against Officer Mitch Zgorzynski
- Negligence/Wrongful Death against Dr. James Brady

The motions for summary judgment relate to all these claims, but I begin with the federal claims.

### I. The Emergency Medical Treatment and Active Labor Act Claim against Arkansas Valley Regional Medical Center

The Emergency Medical Treatment and Active Labor Act (the Act, or EMTALA), 42 U.S.C. § 1395dd, was enacted to prevent hospitals from "dumping" patients that they could treat but who could not pay for services.[1] *Ingram v. Muskogee Reg. Med. Ctr.*, 235 F.3d 550, 551 (10th Cir. 2000). Hospitals have two primary obligations under the Act. "First, the

---

[1] The Sixth, Ninth, and D.C. Circuits have held that the express language of the Act makes it clear it "applies to any and all patients, not just to patients with insufficient resources." *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir. 1991); *see also Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1039–41 (D.C. Cir. 1991); *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268–269 (6th Cir. 1990).

- 4 -

hospital must conduct an initial medical examination to determine whether the patient is suffering from an emergency medical condition." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001). Second, if an emergency medical condition exists, the hospital must "stabilize the patient before transporting him or her elsewhere." *Id.*

The Act has significant limits, however. It is "not a substitute for state law on medical malpractice, [and] [i]t was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." *Neeseman v. Mt. Sinai West*, No. 17-cv-1766 (LGS), 2018 WL 626358, at *4 (S.D.N.Y. Jan. 30, 2018) (quoting *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792 (2nd Cir. 1999); *see* 42 U.S.C. § 1395dd(f) ("The provisions of this section do not preempt any State or local law requirement."); *Lorenz v. Managing Dir., St. Luke's Hosp.*, No. 09-cv-8898 (DAB) (JCF), 2010 WL 4922267, at *8 (S.D.N.Y. Nov. 5, 2010) (EMTALA was "not intended to create a federal malpractice statute or cover cases of hospital negligence." (citation omitted)); *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992) ("Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery.").

In order to state a claim under the Act, therefore, "a plaintiff must allege that he went to the emergency room of a participating hospital seeking treatment for a medical condition, and that the hospital did not adequately screen him to determine whether he had an emergency medical condition, or discharged or transferred him before such a condition had been stabilized." *Kolari v. N.Y.-Presbyterian Hosp.*, 382 F. Supp. 2d 562, 573–574 (S.D.N.Y. 2005) (vacated in part on other grounds, 455 F.3d 118 (2nd Cir. 2006)).

Plaintiffs do not claim inadequate screening by the hospital. *See* Dkt. 71 at 1 n. 1 ("Plaintiffs did not plead a screening claim, (ECF 1, ¶¶ 98, 99) and are not pursuing one here."). Plaintiffs instead allege the hospital failed to stabilize Mr. Hart before releasing him to law enforcement in violation of Section 1395dd(b)(1)(A). Dkt. 1 at 19. Under the Act, the stabilization requirement for Mr. Hart was triggered once the hospital learned he had an emergency medical condition. *See* 42 U.S.C. § 1395dd(b)(1). The hospital does not dispute that Mr. Hart had an "emergency medical condition"—suicidal ideation—under the Act. *See* Dkt. 64 at 11; *See Eberhardt v. City of L.A.,* 62 F. 3d 1253, 1258–59 (9th Cir. 1995) (noting federal courts recognize suicidality as an emergency medical condition under EMTALA). Rather, it argues Mr. Hart was stabilized at the time he left the hospital and thus the requirements of the Act were met.

The Act defines "stabilized" as a state in which "no material deterioration of the condition is likely, within reasonable medical probability, to result." § 1395dd(e)(3)(B). This is a legal, not a medical conclusion. "A patient may be in a critical condition and still be stabilized under the terms of the Act, and the Act does not require a hospital to alleviate completely a patient's emergency condition." *Brooker*, 947 F.2d at 415 (cleaned up).

Under these standards, and viewing the material facts in the light most favorable to Plaintiffs, I agree with Arkansas Valley that the undisputed evidence shows that the hospital met the stabilization conditions for Mr. Hart prior to his release into police custody. It's undisputed that Dr. Brady was aware of Mr. Hart's suicidal ideation at his admission, and that this was an emergency medical condition that required stabilization prior to being released. Dkt. 64-3 at 8–9; Dkt. 64-4 at 5 (Dr. Brady's Depo.). It's also undisputed that Dr. Brady could not conduct a

- 6 -

full mental health evaluation of Mr. Hart due to his intoxication, *see* Dkt. 64-3 at 9, and that the common practice in an emergency room context for this situation is to return "a suicidal arrestee without an acute medical condition [] into police custody" and bring him back for "an evaluation when he was sober."[2] Dkt. 64-14 at 4 (Perry Expert Report); Dkt. 64-3 at 2 (Off. Zgorzynski Depo.). Before that occurred, however, Dr. Brady screened Mr. Hart for signs that he might hurt himself, whether he had physical trauma, a head injury, broken bones, was able to walk independently or was at risk of falling, at risk of aspirating from vomit, or if he had severe dehydration. Dkt. 64-4 at 3–5. After he determined Mr. Hart was medically stable, Dr. Brady filled out discharge papers and the Otero County Sheriff's Office Medical Clearance Report, which included a specific note that if suicidal ideation persisted, officers should contact a mental health facility. Dkt. 64-5 at 11. It's also undisputed that Officer Zgorzynski testified that before Mr. Hart was released, Dr. Brady told him "to watch Hart but have him come in for an evaluation after he was sober," Dkt. 64-3 at 2, and that he would inform staff "at Otero County Jail to put Mr. Hart on suicide watch." *Id*. at 9–10. After a forty-minute visit to the hospital, Mr. Hart was released into police custody.

Against this, Plaintiffs provide no competent evidence that would permit a reasonable juror to conclude that it was likely Mr. Hart's condition would "materially deteriorate" after release or that Mr. Hart was treated any differently than other patients in similar conditions. *See St. Anthony Hosp. v. U.S. Dep't. of Health and Hum. Servs.*, 309 F.3d 680, 697 (10th Cir. 2002) (noting EMTALA's definition of stability is "no

---

[2] Plaintiffs do not dispute that the hospital staff evaluates arrestee-patients two to three times daily "to determine if they are safe for transfer to [police custody]." Dkt. 71 at 3.

material deterioration of the condition is likely, *within reasonable medical probability*") (emphasis in original). Plaintiffs point to their expert, Dr. Pilcher, who does indeed state that in his opinion, Mr. Hart was not stable when the hospital released him to custody. *See* Dkt. 64-11 at 4 (Pilcher Expert Report). Other than this ultimate conclusion, however, Dr. Pilcher's opinion does not actually contradict that of Dr. Brady or others from the hospital. In fact, Dr. Pilcher also testified that no material deterioration was likely to result by discharging Mr. Hart into police custody had police followed its policies to ensure his safety. *See* Dkt. 64-9 at 15. This is precisely Arkansas Valley's position. *See* Dkt. 64 at 11–14.

The only question then is whether it was reasonable for hospital officials to believe police would follow their suicide-prevention policies. All the evidence supports the conclusion that it was. *See* Dkt. 64-12 at 4 (Sovndal Expert Report); 64-13 at 4 (Stansbury Expert Report); 64-14 at 4 (Perry Expert Report); 64-15 at 4 (Smith Expert Report). And Dr. Pilcher admitted he had no basis to question that presumption. *See* Dkt. 64-9 at 9 (Q: "So in your entire 44-year career, you can never recall a situation where you had an intoxicated person, under arrest, brought to the emergency department and they expressed self-harm? A. I cannot recall a single case."). Ultimately, while Dr. Pilcher does frame his opinion in terms of stabilization, his testimony on this point is either a legal rather than medical conclusion, *see, e.g.*, Dkt. 64-11 at 4 ("Dr. Brady's discharge of an unstable patient is an EMTALA violation in that an adequate medical screening exam was never done."), conclusory, *see, e.g.*, *id.* ("Being suicidal is a red flag for being unstable."), or it misstates the standard. *Id.* ("Mr. Hart had an emergency behavioral health condition, was unstable when he arrived at the hospital and was no better when he arrived at the jail."); *cf.* 42 U.S.C. § 1395dd(e)(3)(B) (standard is to

avoid "material deterioration," not to resolve it); *see also Brooker*, 947 F.2d at 415 ("The Act does not require [a hospital] to alleviate completely [a patient's] emergency condition."). Had the hospital simply released Mr. Hart and sent him off on his own ("patient-dumping"), or had it sent him back to police custody without informing them of his suicidal ideations, then it might be said that his condition was likely to deteriorate. But that is not what the undisputed facts show.

Overall, Dr. Pilcher's testimony shows at most a disagreement about whether the hospital and Dr. Brady's treatment was reasonable under the circumstances. He and Plaintiffs may be right that Arkansas Valley should have done more to ensure that police would not let Mr. Hart harm himself. In hindsight, it is obvious everyone should have done more. But disputes between medical professionals about the reasonableness of a treatment and observation plan are what traditional medical malpractice actions are meant to answer. It is not what EMTALA does. *See Gatewood,* 933 F.2d at 1040–41 ("[W]e cannot agree that [EMTALA] creates a sweeping federal cause of action with respect to what are traditional state-based claims of negligence or malpractice."); *Bryan v. Rectors & Visitors of the Univ. of Va.,* 95 F.3d 349, 351–52 (4th Cir. 1996) (same); *Thornton v. S.W. Detroit Hosp.,* 895 F.2d 1131, 1134 (6th Cir. 1990) (same); *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136–37 (8th Cir. 1996) (same); *Deberry v. Sherman Hosp. Ass'n,* 741 F.Supp. 1302, 1305 (N.D. Ill. 1990) (same); *Ingram*, 235 F.3d at 552 (same).

To be sure, some courts appear to have allowed similar cases to proceed. *See Endicott v. Choctaw Cty. City of Hugo Hosp. Auth.*, No. CIV-21-319-RAW, 2023 WL 6323077, at *5 (E.D. Okla. Sept. 28, 2023); *Martinez v. Lea Reg'l Hosp. LLC*, No. 2:21-cv-1191-WJ-GJF, 2022 WL 17584023, at *8–9 (D.N.M. Dec. 12, 2022); *Jones v. Beth Israel Hosp.*, No. 1:17-cv-3455-GHW, 2018 WL 1779344, at *8 (S.D.N.Y. Apr. 12,

2018); *Mahone v. Med. Ctr., Inc.*, No. 17-cv-113 (MSH), 2017 WL 6559911, at *8–9 (M.D. Ga. Dec. 22, 2017). The temptation to follow them, given the tragic outcome here, is strong. But "[c]onsistent with the statutory language, the legislative history shows that Congress enacted EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay." *Eberhardt*, 62 F.3d at 1258. Here, there is evidence that might support the conclusion that Arkansas Valley acted negligently, and there are state remedies for such claims.[3] There is no evidence, however, that its decision was any different than it would have been with any other patient in the same condition. This federal statute then is not implicated and this claim must be dismissed.

## II. Section 1983 Claims Against the City of La Junta

Plaintiffs bring four Section 1983 claims against the City of La Junta, each alleging that the City is liable for Mr. Hart's suicide for slightly different reasons. Dkt. 1 at 13–17. Municipal institutions are subject to suits under Section 1983, but they cannot be sued vicariously "for an injury solely inflicted by its employees or agents." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). Rather, to be held liable the municipality itself must have been the "moving force" behind the alleged constitutional violation, either through official policy or wide-spread and pervasive custom. *See City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). To plead a claim against a municipality under Section 1983, a plaintiff must allege that: "(1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George v. Beaver Cnty.*, 32 F.4th 1246, 1253

---

[3] *See* Section III, below.

(10th Cir. 2022) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769–71 (10th Cir. 2013)). A plaintiff may demonstrate a municipal policy or custom through several methods, including: (1) a formal regulation or statement, (2) informal custom that amounts to a widespread practice, (3) decisions of employees with final policymaking authority, (4) ratification by policymakers of decisions of subordinates, or (5) the failure to adequately train or supervise employees in a way that amounts to deliberate indifference. *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019) (quotation marks omitted).

Although Plaintiffs bring four separate claims, they all require the same fundamental showing in these circumstances: "claims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand Cnty.*, 119 F.3d 862, 866 (10th Cir. 1997). A constitutional violation of this kind occurs when a prison official . . . acts with deliberate indifference to a substantial risk of harm to inmate health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).[4] "A claim of deliberate indifference includes both an objective and a subjective component." *Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014). A plaintiff must satisfy both components. *Rife v. Okla. Dept. of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017). The City does not dispute that Mr. Hart's suicide fulfills the objective

---

[4] This test was originally created in the context of the Eighth Amendment, which applies after conviction; however, the same test applies under the Fourteenth Amendment to pre-trial detainees, such as in this case. *See Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985) ("Nevertheless, pretrial detainees are in any event entitled to the degree of protection against denial of medical attention which applies to convicted inmates.").

- 11 -

component, and Plaintiffs focus on the subjective component.

To meet the subjective requirement of a deliberate indifference claim, a plaintiff must show that a prison official knew of and disregarded an "excessive risk" to his health or safety by failing to take reasonable measures to abate it. *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quotations omitted). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (brackets omitted) (quoting *Farmer*, 511 U.S. at 837). A fact-finder may conclude a prison official knew of a substantial risk when the risk was obvious. *See Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1045 (10th Cir. 2022). But this requires showing that in the circumstances, "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998) (citing *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

Plaintiffs' claims point to four policies or customs that they say caused Mr. Hart's suicide: inadequate supervision, inadequate training, inadequate staffing, and inadequate physical facilities. Dkt. 1 at 13–18. While different theories, each of these requires the same rigorous showing of causation and culpability. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405. "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770 (internal quotation

omitted).

The failures Plaintiffs point to include that the jail's policy of checking on inmates every fifteen minutes is inadequate to prevent suicide even if followed, that the policy of logging those welfare checks was not enforced, that it did not implement any suicide mitigation techniques or provide arrestees with suicide-proof garments, that officers were not provided training on how quickly a suicide can occur, that officers (like Officer Zgorzynski) were required to both watch detainees and fill out paperwork, that dispatchers were also used to watch detainees, and that the conditions of the jail were inadequate to house suicidal arrestees. *See* Dkt. 83 at 8–14. Even assuming all this is true, however, it does not support a reasonable inference that the City was deliberately indifferent to a known risk.

Suicide is of course a known risk, both in jail settings in general, and specifically in Mr. Hart's case. But the facts here, even in the light most favorable to Plaintiffs, do not show deliberate indifference to that risk by City officials. Instead, the undisputed facts show that the City had policies in place specifically meant to mitigate this risk. It got most of those policies from a widely used national provider of jail policies and trainings. Dkt. 65 at 4. Its actual policy was to check on detainees every fifteen minutes. Dkt. 65-4 at 9. That was not done here. Its actual policy would have removed the means Mr. Hart used to commit suicide. Dkt. 65 at 12. That was not done here.

Plaintiffs do not contest any of this. They respond in three main ways. One, they argue that the City was knowingly violating its own policies. Dkt. 83 at 7–10. But the policy knowingly being violated was the requirement to *log* the fifteen-minute checks. *Id.* at 8–9. While logging the checks would be a best practice, there is no reasonable argument that failure to log checks was the cause of Mr. Hart's suicide.

- 13 -

Two, Plaintiffs argue that while removing Mr. Hart's hoodie string might have prevented this particular means of suicide, this merely creates a fact dispute about whether Mr. Hart would have committed suicide by some other means because he could have "retain[ed] possession of clothing he could use to fashion a ligature." *Id.* at 11. Plaintiffs point to no authority, however, that supports the conclusion that municipal liability under *Monell* can be based on a City's failure to prevent an alternative, hypothetical harm rather than the actual harm that occurred. Nor do they explain what reasonable means the City could put in place to remove any such clothing that might be used to fashion a ligature.

Third, Plaintiffs argue that the City did not do enough to train employees or provide them with sufficient tools to prevent suicide. *Id.* at 7, 9. But it is not enough to say that officers could have had more training, or that an officer admitted that additional training would have been helpful. *See id.* at. 12. Plaintiffs in these cases must meet the very difficult burden of showing not just that the City could have done more, and not even that the City *knew* it could do more. Plaintiffs must show that the City knew that without doing more (whether it comes to training, enforcing policies, staffing, or facilities) its employees were likely to deprive citizens of their constitutional rights. *See Waller* 932 F.3d at 1284.

And here, there is no reason in the record for the City and its policymakers to think that it was "highly predictable" or "plainly obvious" that their policies would lead to a detainee's suicide. *See Barney*, 143 F.3d at 1307–08. The evidence is that in prior years there had been two suicide attempts, both of which were prevented by staff intervention. Dkt. 97 at 7. This is not enough to put the City on notice. *See Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766, 780 (7th Cir. 2014) ("The bare fact that other inmates attempted suicide does not demonstrate that the jail's policies were inadequate, that officials were aware of any

- 14 -

Case No. 1:23-cv-00134-DDD-MDB  Document 105  filed 03/19/25  USDC Colorado
pg 15 of 16

pg 15 of 16

suicide risk posed by the policies or that officials failed to take appropriate steps to protect [a particular inmate]."). The evidence is that the City had in place common policies intended to mitigate the very risk that came to pass in this case. To the extent the evidence shows that the City knew those policies were not followed, it was in respect to documentation, not to anything that would have prevented the harm here. On the other hand, its policy against leaving detainees with dangerous items of clothing was material in this case, but there is no evidence to support the inference that the City should have known that it would be violated. In sum, the City had no reason to believe its policies and practices were likely to lead to a successful suicide attempt.[5] Tragic as it is, the law does not permit application of hindsight to cases such as this, so these claims must be denied.

### III.  State Claims

Because all of Plaintiffs' federal claims are dismissed, pursuant to 28 U.S.C. § 1367(c)(3), it would not be proper to exercise jurisdiction over Plaintiffs' remaining three state claims. *See Smith v. City of Enid*, 149 F. 3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."). That is particularly appropriate in this case where at least some of those claims appear to present relatively novel questions of state law and may have some merit. The state-law claims are therefore dismissed without prejudice to refiling in state court.[6]

---

[5] Plaintiffs' failure to meet their burden on this point undermines all of their claims. So, while it is true, as Plaintiffs note, that the City's motion for summary judgment does not address their claims under inadequate staffing or physical facility theories in detail, those claims still fail for this reason.

[6] Declining to exercise jurisdiction does not foreclose relief in the event

## CONCLUSION

It is **ORDERED** that:

The Motions for Summary Judgment, **Dkt. 64, 65, 67, 68,** are **GRANTED**;

Plaintiffs' federal claims are **DISMISSED**; and

Plaintiffs' state-law claims are **DISMISSED** without prejudice to refiling in state court.

The Clerk of Court is directed to close this case.

DATED: March 19, 2025            BY THE COURT:

~~Daniel D.~~ Domenico
United States District Judge

---

Plaintiffs refile their claims in state court. *See* 28 U.S.C. § 1367(d).

- 16 -